NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1177-25

MONICA TENNANT,
Administratrix Ad Prosequendum
for the ESTATE OF MICAH
SAMUEL TENNANT-DUNMORE,
ANGELA TENNANT, and M.T.,
a minor, by her Parent and Guardian
Ad Litem, ANGELA TENNANT,

     Plaintiffs-Respondents,

v.

PLEASANTVILLE BOARD OF
EDUCATION,

     Defendant/Third-Party
     Plaintiff-Appellant,

and

DENNIS ANDERSON, HOWARD
JOHNSON, STEPHEN TOWNSEND,
DANNY ADCOCK, and NEW
JERSEY STATE
INTERSCHOLASTIC ATHLETIC
ASSOCIATION,

     Defendants/Third-Party
     Plaintiffs,

v.

ALVIN WYATT,

**APPROVED FOR PUBLICATION**

**August 10, 2026**

**APPELLATE DIVISION**

Third-Party Defendant.

Argued May 20, 2026 – Decided August 10, 2026

Before Judges Currier, Berdote Byrne and Jablonski.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Atlantic County, Docket No. L-2985-21.

Roshan D. Shah argued the cause for appellant (Shah Law Group, attorneys; Roshan D. Shah and Todd S. McGarvey, of counsel and on the briefs).

Oliver T. Barry argued the cause for respondents (Barry Corrado & Grassi, PC, attorneys; Oliver T. Barry, on the brief).

The opinion of the court was delivered by

CURRIER, P.J.A.D.

In this tragic case, where ten-year-old Micah Tennant-Dunmore was fatally struck by a bullet intended for another while he attended a high school football game, we consider whether defendant Pleasantville Board of Education (PBOE) can be civilly liable to Micah under the New Jersey Civil Rights Act (NJCRA), N.J.S.A. 10:6-2(c) and the New Jersey Constitution, Article I, ¶ 1 under a state-created danger theory.

The New Jersey Supreme Court has found a state actor liable under a state-created danger theory only one time, in Gormley v. Wood-El, 218 N.J. 72 (2014).  There, the plaintiff, a public defender, was brutally attacked while

A-1177-25

visiting an involuntarily committed client in an unsupervised area at Ancora Psychiatric Hospital (Ancora), a state-managed facility. Id. at 83-90. The Court concluded there was evidence that the state defendants had acted with deliberate disregard for the plaintiff's safety, given the number of assaults that had occurred against attorneys in the visiting room at Ancora. Id. at 109.

The trial court here relied on Gormley to deny PBOE's motion for summary judgment. After our de novo review and viewing plaintiffs' contentions in the most favorable light, as we must, Comprehensive Neurosurgical, P.C. v. Valley Hospital, 257 N.J. 33, 73 (2024), we conclude Gormley was a narrow and unique set of circumstances that are not present here. Plaintiffs have not demonstrated PBOE created a danger which would expose it to liability and permit an exception from the well-established precedent that a person does not have a constitutional right to have a state actor protect them from criminal misconduct of another. See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 197-99 (1989). We reverse the order denying PBOE summary judgment.

I.

On October 28, 2019, eighteen days before the subject football game, Ibn Abdullah fired shots at Alvin Wyatt in Atlantic City. Wyatt's cousin died in connection with that shooting.

A-1177-25

On November 15, plaintiff Angela Tennant brought her son Micah and his sister to the playoff football game between Pleasantville High School (PHS) and Camden High School. The family arrived at the PHS field at the beginning of the third quarter and bought tickets to enter the game. Micah and his sister were not students in the Pleasantville school district.

At the time, defendant Dennis Anderson was interim superintendent of PBOE, defendant Howard Johnson was the principal of PHS, defendant Stephen Townsend was the athletic director for PBOE, and defendant Danny Adcock was director of school safety.

Adcock had created a security plan for the football game, which increased the normal assignment of three Pleasantville Police Department officers to six officers, assisted by a K-9 unit. The officers were "strategically positioned around the perimeter of the football field and the bleachers to allow for maximum exposure and visibility and increase[d] response time in the event of an incident." Additionally, seven event staff were positioned in the parking lot, entrance, end zone and concession stand. The Camden Police Department was also providing a "minimum of two (2) police officers and several additional security personnel to assist at the event." Attendees were only permitted to bring in a bag no larger than the size of a small purse.

4

Adcock attended the game along with the Pleasantville police chief and a Class III officer.[1] In all, there were ten armed officers in attendance. Metal detectors were not employed at the game, given that they were not utilized at any PHS sporting events.

Sometime after halftime, Wyatt arrived at the PHS football field and entered the game through the main entrance with an illegal firearm. Wyatt fired six or seven shots at Abdullah, who was seated in the bleachers, and then ran away. Micah, also seated in the bleachers, was struck by one of the bullets and died five days later. In September 2023, Wyatt was convicted of murder and weapons charges and sentenced to seventy years in prison.

Following the shooting, PBOE implemented the scanning of attendees at PHS athletic events with metal detectors.

## II.

In 2021, plaintiffs instituted suit against PBOE, the four individual PBOE employees and defendant Interscholastic Athletic Association (IAA). The complaint asserted common law claims for: dangerous condition of property (Count I, against PBOE and IAA); dangerous condition of

---

[1] A Class III officer is "a retired officer who has previously served as a duly qualified, full-time law enforcement officer in any municipality, county agency of this state, bi-state agency, or federal agency and must be living in New Jersey." Police Training Commission, Special Law Enforcement Officer—Class III 1 (2019).

property/bystander liability (Count II, against PBOE and IAA); state-created danger, a due process violation under NJCRA and Article I, ¶ 1 of the New Jersey Constitution (Count III, against PBOE and the individual defendants); and direct entity liability (Count IV, against PBOE and the individual defendants). Plaintiffs generally alleged there was no metal detector at the entrance to the field and that PBOE failed to take appropriate safety measures. PBOE defendants filed an answer and third-party complaint against Wyatt, the shooter.

During Adcock's deposition, he testified metal detectors had never been used at PHS sporting events, including football games. He conceded it would have been a preventative safety measure to have metal detectors at the football field. Adcock acknowledged there were metal detectors at the entrance to the PHS building. Adcock was aware there had been a shooting at a little league football game at a different field four years earlier, in 2015.

Plaintiffs retained an expert—The Right Stuff Consulting Inc.—to "provide an expert opinion regarding whether proper practices regarding entertainment facilities and event management were established or followed by [PBOE] and the other defendants." The expert report, authored in 2024, stated that "[s]ince 2017, there have been at least 835 documented police responses to calls to [PHS]. These include fights, assaults, sexual assaults, and weapons

6

possession types of incidents." Superintendent Anderson agreed that Pleasantville was considered a high-crime area.

PBOE, the individual defendants, and IAA moved for summary judgment. After oral argument, the court issued an oral decision on August 12, 2025. The court dismissed Counts I and II of plaintiffs' complaint, finding PBOE had not created a dangerous condition and was entitled to immunity under the New Jersey Tort Claims Act, N.J.S.A. 59:5-4. Addressing Counts III and IV, the court granted summary judgment to the individual defendants on the NJCRA claims but denied the motion as to PBOE. Therefore, the only surviving cause of action was the direct entity count against PBOE.[2]

### III.

On appeal, PBOE contends the trial court erred in denying its motion for summary judgment because the court misapplied Gormley and plaintiffs did not establish a valid claim under Monell v. Department of Social Services of New York, 436 U.S. 658, 690-91 (1978).

We review a trial court's decision to grant summary judgment de novo. Christakos v. Boyadjis, 262 N.J. 447, 462 (2026). We consider "whether the competent evidential materials presented, when viewed in the light most

---

[2] The court also granted the uncontested summary judgment motion in favor of IAA.

favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Statewide Ins. Fund v. Star Ins. Co., 253 N.J. 119, 125 (2023) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)). A motion for summary judgment will be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." Green v. Monmouth Univ., 237 N.J. 516, 529 (2019) (internal quotation marks omitted) (quoting R. 4:46-2(c)).

In denying summary judgment to PBOE, the trial court discussed general concepts of duty and foreseeability, and the applicability of Gormley, and determined the shooting was sufficiently foreseeable to support a claim of state-created danger. The court further found Gormley did not require a special relationship akin to custody, obviating plaintiffs' need to establish that element. The court also found plaintiffs presented sufficient evidence to permit a reasonable jury to conclude that PBOE created a dangerous situation by failing to screen attendees for weapons at the football game. The court further found PBOE had a policy and practice of not using metal detectors at sporting events despite the prior incidents of violence in the area. The court

A-1177-25

found it was best left to a jury to determine whether PBOE's actions shocked the conscience.

## A.

We start with the limited governing case law regarding the state-created danger theory, a doctrine not yet accepted by the United States Supreme Court as a viable cause of action. However, federal circuit courts of appeal, including the Third Circuit, have relied on DeShaney to conclude that "state and local officials may be held liable under [the Federal Civil Rights Act, 42 U.S.C. § 1983] for death or injury suffered as a result of a 'state created danger.'" Gonzales v. City of Camden, 357 N.J. Super. 339, 346 (App. Div. 2003).

In DeShaney, a young boy was permanently disabled by abuse he suffered in his home at the hands of his father. 489 U.S. at 191. The father's violent behavior had been reported repeatedly to the local social services agency, but the agency, nevertheless, had returned the child to his father's care. Ibid. The child and his mother argued the State had violated the child's due process right under section 1983 to protection from his violent father. Id. at 193. The Supreme Court affirmed the general rule that a state's failure to protect its citizens from private violence does not violate the due process clause of the Fourteenth Amendment. Id. at 189-90. Further, the State is not

A-1177-25

responsible for protecting an individual from harm inflicted by another means. Ibid. Therefore, the Court concluded the State did not violate the child's due process rights when it failed to protect him from his father. Ibid.

However, the Court noted, in limited circumstances, the State owes a duty of care to individuals that are "incarcerated" or "involuntarily committed." Id. at 198-99. This is because the State has imposed a limitation on that person's freedom to act on their own behalf. Id. at 199-200. This has been described as the "special relationship" exception to the general rule.

Circuit courts have also relied on DeShaney to recognize an additional exception: the state-created danger doctrine. This derives from the Court's observation that: "While the State may have been aware of the dangers that [the plaintiff] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." Id. at 201. "That language, in addition to the holdings of pre-DeShaney cases, has led other courts to find that a state can be held liable if it places a person in a position of danger that the person would not have been in without the state action." Est. of Strumph v. Ventura, 369 N.J. Super. 516, 525 (App. Div. 2004).

A-1177-25

In <u>Bright v. Westmoreland County</u>, 443 F.3d 276, 281 (3d Cir. 2006), the Third Circuit articulated four factors necessary to establish state-created danger:

> (1) "the harm ultimately caused was foreseeable and fairly direct;"
>
> (2) a state actor acted with a degree of culpability that shocks the conscience;
>
> (3) a relationship between the state and the plaintiff existed such that "the plaintiff was a foreseeable victim of the defendant's acts," or a "member of a discrete class of persons subjected to the potential harm brought about by the state's actions," as opposed to a member of the public in general; and
>
> (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

The New Jersey Supreme Court has addressed the state-created danger doctrine only in <u>Gormley</u>, in circumstances where the plaintiff public defender was attacked by an involuntarily committed client in an unsupervised "day room" in Ancora where attorneys and psychiatrists were frequently violently attacked by mentally ill patients. 218 N.J. at 87-88. The plaintiff asserted causes of action under the Federal Civil Rights Act, 42 U.S.C. § 1983 and the NJCRA. <u>Id.</u> at 83.

11

The Court applied the Bright factors to determine whether there was a state-created danger that violated the plaintiff's due process rights. Id. at 106-11. The Court concluded the plaintiff was a member of a discrete class of victims subject to the foreseeable harm set in motion by the defendants, who were state actors. Id. at 106-07. This was because Ancora officials controlled and restrained the movements of residents and visitors within the locked facility. Id. at 107. The Court found the discrete class of foreseeable victims were "professionals required to meet in the volatile day room with patients." Ibid. Moreover, Ancora was aware of thousands of assaults committed on its grounds, including 810 incidents against staff members and visitors. Id. at 88. Attorneys and psychiatrists were frequently victims of the attacks. Id. at 107. Thus, the Court found an assault was foreseeable. Ibid.

The Court also concluded defendants

> affirmatively used their authority to create the danger that made [the plaintiff] more vulnerable to the assault. [The plaintiff] was not acting in the "free world" but rather in a locked institutional environment over which defendants exercised total control, including control over where [the plaintiff] met with her client . . . .
>
> [Id. at 108.]

The Court stated

> [d]efendants not only controlled and restrained [the plaintiff's] physical movements, but they also

12

A-1177-25

possessed knowledge of the special dangers that [the patient] might pose to the unsuspecting attorney, who was meeting her client for the first time. The institution assigned [the patient] Continuous Visual Observation status because of the particular safety risk the patient posed to herself and others. A staff member, who presumably knew of [the patient's] CVO status, brought her to the day room—brought her in contact with [the plaintiff]. But no one told [the plaintiff] of the heightened-risk assessment. When [the plaintiff] sat catty-corner to [the patient] because the din in the day room made a confidential, lawyer-client conversation impossible—that was the environment defendants had created, an environment conducive to the many assaults that frequently occurred in the day room. Having brought the dangerous patient together with the attorney in an unsecured setting, [the plaintiff] literally was left to fend for herself when she was viciously attacked. [The plaintiff]'s injuries were not a result of defendants' inaction, but the result of their protocols, the affirmative steps that created an institutional environment in which patients could freely attack their attorneys and psychiatrists.

[Id. at 108-09 (Internal citations omitted).]

The Court also found there was sufficient evidence to meet the Bright shock-the-conscience standard, stating "defendants acted with deliberate indifference to the foreseeable dangers threatening the physical safety of attorneys constitutionally assigned to represent committed patients." Id. at 109. The Court noted the expert testimony indicating "the level of violence at Ancora was unique to that institution," and given the extraordinary number of assaults, "defendants executed a policy, over a course of years, in complete

13

A-1177-25

disregard of the known danger that mentally disturbed patients were attacking professionals, such as Gormley, in the ward's day room." Ibid. The Court described the defendants as "complacent" regarding "the ongoing violence committed against attorneys at Ancora," an attitude that could "be viewed by a jury as shocking by itself." Ibid. Therefore, the Court found the plaintiff had satisfied the Bright factors, precluding summary judgment and permitting a jury to consider whether the defendants had violated the plaintiff's substantive due process right to be free from state-created dangers under the Fourteenth Amendment.

The Court cautioned it had considered the totality of the circumstances of the "egregious" facts presented in the case, not the individual Bright factors in isolation, to conclude the situation was conscience-shocking. Id. at 111. In finding the defendants acted with deliberate indifference to the violence that threatened the plaintiff, the Court described Ancora officials as "the architects of an environment in which anarchy reigned in the day rooms of Ancora." Ibid.

The Gormley Court also noted that a "special relationship" arises when the State has taken a person into custody against his or her will. Id. at 118 (LaVecchia, J., dissenting). Under those circumstances, the State has an affirmative duty of care and protection for the person because of the special

14

relationship.  Ibid.  However, the Gormley majority did not address whether the plaintiff had a special relationship with Ancora, stating in footnote 11:

> We do not address Gormley's argument that her "special-relationship" with Ancora is a separate basis for liability because, in the context of the facts before us, that relationship is subsumed within state-created-danger liability.  Indeed, some courts have questioned whether there is a distinction between special-relationship and state-created-danger liability.  See Paine v. Cason, 678 F.3d 500, 510 (7th Cir. 2012); Ketchum v. Cnty. of Alameda, 811 F.2d 1243, 1247 (9th Cir. 1987); Est. of Gilmore v. Buckley, 787 F.2d 714, 722 (1st Cir. 1986).  But see Kneipp v. Tedder, 95 F.3d 1199, 1209 n. 22 (3d Cir. 1996) (viewing "special relationship" and state-created danger as distinct).  At least for our purposes here, we do not have to decide whether those doctrines are different.
>
> [Id. at 110 n.11 (Citations reformatted).]

In sum, the DeShaney Court held the State only had a duty of care to individuals that were "incarcerated" or "involuntarily committed" because the State had imposed a limitation on that person's freedom to act on his or her own behalf.  489 U.S. at 198-200.  However, the State is not responsible to protect an individual from harms inflicted by outsiders when the victim is not in a custodial relationship with the State.  That is the special relationship theory.  Plaintiffs here do not assert liability under the special relationship theory.

15

A-1177-25

In Gormley, our Supreme Court adopted a state-created danger theory, relying on the Bright factors for its analysis of the totality of the extraordinary facts presented there. It is under that theory that plaintiffs assert a direct entity claim against PBOE.

B.

The trial court found plaintiffs established sufficient evidence of a state-created danger to preclude summary judgment to PBOE and permit the case to proceed to a jury determination. In our de novo review, we must analyze the Bright factors as required under Gormley.

We consider factors one and three together as they "overlap to some degree." Gormley, 218 N.J. at 101. Therefore, plaintiffs must present evidence that the harm caused to Micah was foreseeable and fairly direct; and Micah was a specifically foreseeable victim or part of a discrete class of foreseeable victims, as opposed to an undifferentiated member of the general public. Id. at 101-02.

The trial court found there was sufficient evidence for a jury to find "the defendants foresaw that some kind of violence or injury could occur at this football game." The court explained because defendants had some security measures in place, such as the hiring of police officers, defendants were acknowledging "violence was possible." In addition, the court stated

16

"defendants had actual knowledge of criminal and violent incidents at the school. That the city . . . was in a high-crime area. There was a prior shooting, . . . at a nearby field." The court discussed gun violence in general and in schools, and the fact that PHS used metal detectors at its school entrance. The court stated, "the current reality is that there's a not less than zero chance that at some point someone's going to be the victim of gun violence at a school."

PBOE contends this was a random shooting and they could not have been aware of the likelihood that Wyatt would enter the football field with a gun searching for Abdullah to exact vengeance regarding a completely unrelated shooting three weeks earlier in another city. These are certainly strong arguments before a jury. However, in the context of summary judgment, in which we accord plaintiffs all inferences, we are satisfied there was sufficient evidence for a jury to consider whether the harm caused to Micah was foreseeable and whether he was a member of a discrete class of persons subject to potential harm brought about by the state's actions because PBOE did not screen attendees for firearms, and Micah was a spectator at a PHS sporting event.

However, we part ways with the trial court's determination regarding factors two and four: whether the failure to install metal detectors to screen

attendees at the game was "deliberate indifference" that shocked the conscience; and whether defendants affirmatively used their authority in a way that created a danger to Micah.

The Gormley Court warned the Bright test is a "high bar to vault," and shocking the conscience is not an act of negligence or even gross negligence. 218 N.J. at 112. To satisfy that standard, a plaintiff must show the State acted with "deliberate indifference." Id. at 102-03. "[W]hether conduct is conscience-shocking is a fact-sensitive analysis and will depend on whether the officials' conduct is egregious in light of the particular circumstances." Id. at 103 (citing Cnty. of Sacramento v. Lewis, 523 U.S. 833, 850 (1998)). Plaintiffs here have not presented sufficient evidence to satisfy that element.

In Gormley, the Court found the "level of violence" and "thousands of assaults" at Ancora placed the defendants on notice of the danger to visiting attorneys, requiring the defendants to take some affirmative action for a visitor's physical safety. 218 N.J. at 109. Plaintiffs here have not presented the egregious totality of circumstances to meet the Bright conscience-shocking factor. The evidence here—that the city of Pleasantville was generally considered a high crime area and there were acts of violence at PHS—could unfortunately describe and pertain to an infinite number of situations in this or any state. We cannot conclude that was the intent of Gormley and most likely

18

is why no New Jersey court has ever again found the narrow, horrific, and extraordinary circumstances required to impose liability on a state actor to protect a citizen from the criminal misconduct of a private actor. Under the circumstances presented here, plaintiffs have not shown defendants acted with deliberate indifference to any foreseeable danger threatening Micah's safety.

As stated, there was no evidence of specific incidents of violence at this football field nor at any prior PHS football game. There was unspecific evidence referencing a prior shooting at a little league football game at another field four years earlier. However, there was no correlation between any event that ever occurred at PHS or at a different field four years earlier, and this shooting, committed by an individual who did not live in the city nor attended either school playing in the game.

Furthermore, unlike the Ancora defendants, PBOE implemented a safety plan, took precautions and attempted to ensure the safety of the attendees. There were nine Pleasantville police officers present at the game. PBOE also hired additional Camden police officers for the event. With these actions, PBOE put into place a strong security presence, an act which precludes any finding of deliberate indifference and disregard for constitutional rights.

Moreover, "[f]actor four requires that a state official affirmatively use his authority either to create the danger or to render a person 'substantially

19

more vulnerable to injury' than he otherwise would have been absent state action." Gormley, 218 N.J. at 103 (citing Schieber v. City of Phila., 320 F.3d 409, 416 (3d Cir. 2003)). "For liability to attach there must be 'affirmative state action' and not just a failure to protect a person from violence by another." Ibid. (citing Bright, 443 F.3d at 284); see also Morrow v. Balaski, 719 F.3d 160, 178-79 (3d Cir. 2013) (stating "the requirement serves . . . to distinguish cases where . . . officials might have done more . . . [from] cases where . . . officials created or increased the risk itself" (alteration and omissions in original)).

PBOE did not take any affirmative action nor establish a protocol or policy that created "an environment in which anarchy reigned." Gormley, 218 N.J. at 111. To the contrary, PBOE implemented a safety plan and attempted to ensure the safety of the attendees. Furthermore, plaintiffs allege PBOE failed to act by failing to install a metal detector at the entrance to the field. That is not an allegation of an affirmative action taken by PBOE that increased the risk to Micah, particularly in light of the strong in-person security measures PBOE implemented using its police officers supported by the Camden police. Therefore, plaintiffs have not satisfied the fourth prong. See Bright, 443 F.3d at 281.

20

The totality of the circumstances presented here does not rise to a substantive due process violation. Plaintiffs have not satisfied the Bright standard to establish a state-created danger theory of liability to hold PBOE responsible for a private actor's criminal misconduct and plaintiffs' resulting damages.

The NJCRA is modeled after the Federal Civil Rights Act, 42 U.S.C. § 1983, and federal interpretation provides guidance in construing the NJCRA. Winberry Realty P'ship v. Borough of Rutherford, 247 N.J. 165, 190 (2021). A government entity may be held liable for constitutional deprivation only if the violation was a result of an official municipal policy or custom. Monell, 436 U.S. at 694; Besler v. Bd. of Educ. of W. Windsor-Plainsboro Reg'l Sch. Dist., 201 N.J. 544, 566-67 (2010). When addressing a Monell claim, a court must consider whether the plaintiff's harm is caused by a constitutional violation, and if so, whether the government entity is responsible for the violation. Collins v. City of Harker Heights, 503 U.S. 115, 120 (1992).

Plaintiffs' Monell claim in Count I was grounded in the assertion that PBOE violated plaintiffs' right to substantive due process. Because we conclude plaintiffs did not establish a constitutional right for PBOE to protect Micah from third-party criminal misconduct, the Monell claim in Count IV should have been dismissed.

21

Reversed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M. C. Healey

Clerk of the Appellate Division

A-1177-25